E-FILED
Monday, 17 August, 2009  11:19:26 AM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RICKEY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-3168 |
| | ) | (and consolidated case |
| CITY OF SPRINGFIELD, | ) | No.  07-3096) |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant City of Springfield, Illinois' (City), Motion for Summary Judgment (d/e 251) (Motion). Plaintiff Rickey Davis is an African American man.  He worked for the City as a police officer from 1981 to 2007.  In the first of these two consolidated cases, Case No. 04-3168 (2004 Action), Davis claimed that the City discriminated and retaliated against him by not promoting him to the position of Deputy Chief of Police in charge of the Criminal Investigations Division (CID or Detective Division), in October 2003 in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq., and 42 U.S.C. §§ 1981 and 1983.  The Court entered partial summary judgment

1

in favor of the City on Davis' §§ 1981 and 1983 claims.  <u>Opinion entered</u> <u>September 19, 2006 (d/e 86) (2004 Action Summary Judgment Opinion)</u>. The Title VII claims were tried to a jury beginning on September 10, 2007. The jury found in favor of the City on Davis' discrimination claim, but could not reach a verdict on Davis' retaliation claim.  <u>Minute Entry entered</u> <u>on September 14, 2007</u>.  This claim is not the subject of the Motion.

In the second of these consolidated cases, Case No. 07-3096 (2007 Action), Davis claimed that after October 2003, the City continued to discriminate and retaliate against him, and also created a hostile work environment, in violation of Title VII and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1983.  Davis claimed that the City's illegal acts ultimately led to his constructive discharge in 2007.

The City seeks summary judgment on Davis' claims in the 2007 Action.  Davis has decided not to pursue his claims under §§ 1981 and 1983.  <u>Plaintiff's Memorandum in Opposition to Defendant's Motion for</u> <u>Summary Judgment (d/e 258) (Davis Memorandum)</u>, at 1 n.1.  The City is, therefore, entitled to partial summary judgment on the §§ 1981 and 1983 claims in the 2007 Action.  As explained below, the City's Motion is also allowed with respect to the Title VII disparate treatment and hostile work

environment discrimination claims, and his constructive discharge claim, and allowed in part and denied in part with respect to Davis' remaining retaliation claim.[1]

## STATEMENT OF FACTS

Davis became a police officer in the City's Police Department (Department or SPD) in 1981. His employment history with the Department is detailed in this Court's prior summary judgment opinion in the 2004 Action. 2004 Action Summary Judgment Opinion, at 9. He has also spoken out on racial issues with the Department and the City. Id., at 9-11. He was the President of the Black Guardians Association, a group of African American police officers in the Department.

On January 7, 2003, Davis and eight other African American officers, or former officers, filed a lawsuit against the City, then Police Chief John Harris, and certain other officers. Davis et al. v. City, et al., Case No. 03-

---

[1]The Court notes initially that the City objected to Davis' use of depositions taken in discovery in Davis' prior case against the city, Case No. 03-3007, and asked the Court to strike these depositions. E.g., Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (d/e 261), at 19, ¶ 167, and at 35-36 ¶¶ 277-80. The objections to the use of these depositions are overruled and the request to strike is denied. The depositions were taken under oath, and the City was represented by counsel at the depositions and had the opportunity to cross examine the witnesses. The depositions are competent evidence to oppose a summary judgment motion. See Fed. R. Civ. P. 56(e). The City does not assert that Davis violated the Rules or an Order of the Court in using these depositions.

3007 (2003 Action). The 2003 Action alleged racial discrimination and retaliation in violation of Title VII and §§ 1981 and 1983. Davis and the other plaintiff officers each alleged separate claims based on each officer's personal experiences. See generally 2003 Action Complaint (Case No. 03-3007 d/e 1). One of Davis' co-plaintiffs was a former Department police officer named Renatta Frazier. In 2002, Frazier was the subject of several Department Internal Affairs (IA) investigations. The most serious charges arose from an incident in October 2001 (Frazier Incident). The press reported that Frazier was accused of responding improperly to a call, and as a result, a rape occurred. The victim's name was Nicole Lenhart. Several months later, the Department revealed that the rape occurred before Frazier was sent on the call, and so she could not have prevented the rape. See 2003 Action Opinion entered November 14, 2006 (Case No. 03-3007 d/e 304) (2003 Action Summary Judgment Opinion), at 20-21. Frazier alleged racial discrimination, constructive discharge, and several state law claims in the 2003 Action as a result of her treatment. 2003 Action Complaint.

In June 2003, Department Sergeant Donald Kliment became the City's Chief of Police. In October 2003, Kliment appointed four new Deputy Chiefs of Police. Davis applied for the position of Deputy Chief in

charge of CID.  Davis was then a Lieutenant in CID.  Kliment selected Lieutenant William Rouse for this position.  <u>2004 Action Summary Judgment Opinion</u>, at 11-16.

On November 2 or 3, 2003, Davis and his attorney in the 2003 Action, A. Courtney Cox, went to the residence of Nicole Lenhart, the victim in the Frazier Incident.  Cox interviewed Lenhart on behalf of Frazier and the other plaintiffs in the 2003 Action.  Davis was present during the interview.  <u>Motion</u>, Exhibit 26, <u>Excepts of Springfield Police Department Internal Affair File #2004/02/15 (IA File 2004/02/15)</u>.

On November 6, 2003, Davis filed a charge of discrimination against the City for failure to promote him to Deputy Chief.  Davis claimed that Kliment chose Rouse (a Caucasian man) over him because of his race, and to retaliate against him because he spoke out on various issues of racial discrimination within the Department.  <u>Davis Memorandum</u>, Exhibit 24. See <u>2004 Action Summary Judgment Opinion</u>, at 12-16.

Davis remained in CID after Rouse became Deputy Chief.  Davis supervised the General Investigations section of CID.  At that time, CID was divided into General Investigations and Special Investigations.  General Investigations investigated property crimes, financial crimes, and sexual

assaults.  Special Investigations included the Major Case Unit, Narcotics, and other specialized units in which Department officers were assigned to work with other law enforcement agencies, such as the Drug Enforcement Agency.  Lieutenant David Dodson supervised Special Investigations.  Davis Deposition, at 25; Davis Memorandum, attached Excerpts of Deposition of William Rouse taken February 19, 2009 (Rouse 2009 Deposition, Davis Excerpts), at 85.

On February 9, 2004, Davis sent an email to Deputy Chief William Pittman. The email had an attachment that consisted of another email that was authored by officer Randy Wilson and addressed to Pittman.  The Wilson email summarized some statements that Davis made in Wilson's presence.  The City had produced the Wilson email in discovery in the 2003 Action.  Pittman was one of the individual defendants in the 2003 Action at the time.  Pittman sent a memorandum to Assistant Chief Ralph Caldwell complaining about Davis' email.  Pittman stated that he viewed the email as an attempt to threaten and harass Pittman.  See Motion, Exhibit 11, Excerpts from Springfield Police Department Internal Affair File #2004/02/14 (IA File 2004/02/14).

On February 18, 2004, Kliment issued a written reprimand to Davis

regarding the February 9, 2004, email to Pittman.  Kliment reprimanded Davis for improper use of the email system.  The written reprimand was also given an IA file number, but no investigation was conducted.  <u>IA File 2004/02/14</u>, <u>Memorandum from Donald Kliment to Rickey Davis dated February 18, 2004</u>.

In February 2004, Kliment also initiated an IA investigation of Davis concerning the November 2003, interview of Lenhart.  <u>IA File 2004/02/15</u>.  Kliment alleged that Davis improperly used his position as a police officer to secure entrance into her residence and to secure an interview.  Kliment alleged that Davis gave Lenhart the impression that he was there in an official capacity as a police officer.  The interview, however, was for his personal benefit and for the benefit of the other plaintiffs in the 2003 Action.  <u>Motion</u>, Exhibit 11, <u>Civil Service Commission File on IA File 2004/2/15) (2004/2/15 Civil Service Commission File)</u>, <u>Specifications of Charges (amended)</u>, at 1.

In March 2004, Kliment told Rouse to transfer Detective Dane Cookson temporarily.  Kliment told Rouse that he wanted the transfer done by the next day.  <u>Motion, attached Excerpts of Rouse 2009 Deposition (Rouse 2009 Deposition City Excerpts)</u>, at 261.  Cookson was temporarily

transferred from CID to Professional Standards, effective March 15, 2004, with a scheduled transfer back to CID on April 4, 2004.  Rouse transferred Cookson without notifying Davis first. Cookson had reported directly to Davis before these two transfers; however, after the April 4, 2004, transfer back to CID, Cookson would report to Lieutenant Dodson.

Davis sent Kliment a memorandum dated March 19, 2004, complaining about not being consulted or notified about the Cookson transfers.  Davis said, in part:

> I was never consulted about either of Detective Cookson's transfers.  I only became aware of Detective Cookson's transfer orders when they were sent out for general distribution.  As Detective Cookson's Lieutenant in charge of General Investigations I do not appreciate this blatant disrespect of my authority.  In the future, I would appreciate at least being notified of such changes, and ideally being involved in the over all process when such changes occur.  This continued retaliation against me is unacceptable.

Davis Memorandum, Exhibit 2, Memorandum from Davis to Kliment, dated March 19, 2004.

Kliment responded in a memorandum dated March 22, 2004.  Kliment stated that he decided to transfer Cookson.  He also stated:

> All of this information was presented at the Super Staff meeting held on Monday, March 15, 2004, in which you attended.  As I went around the room asking members of our staff if they had

any concerns, your response was "No." . . . .

Motion, Exhibit 5, Memorandum from Kliment to Davis dated March 22, 2004.  Kliment, however, agreed in his deposition that he did not advise Davis of the transfer before it occurred.  Davis Memorandum, Exhibit 13, Excerpts of Kliment Deposition dated June 16, 2005 (Kliment 2005 Deposition), at 163.

On April 12, 2004, Davis filed an IA complaint against various officers for mishandling the Frazier Incident.  The complaint was signed by eight officers, including Davis.  Six of the eight who signed the complaint were plaintiffs in the 2003 Action.  Davis Memorandum, Exhibit 26, Memorandum from Members of the Black Guardians Association to Robert Williams, Deputy Chief, Professional Standards Division.

On April 16, 2004, Frazier settled her claims in the 2003 Action. 2003 Action Order entered March 24, 2004 (Case No. 03-3007 d/e 116); Frazier v. City of Springfield, Case No. 04-3071 Order entered April 16, 2004 (Case No. 04-3071 d/e 119).[2]  The Frazier settlement resolved all of her claims.  She was the only plaintiff that alleged claims against Pittman

---

[2]As part of the settlement, Frazier's claims were severed from the claims of the remaining plaintiffs, and moved to a new case file, Case No. 04-3071.

and certain other individual defendants.  After the Frazier settlement, Davis and the remaining officers continued to pursue the 2003 Action only against the City and former Chief Harris.  2003 Action, Text Order entered July 29, 2004.

On June 24, 2004, Rouse reviewed the IA investigation of Davis' involvement in the Lenhart interview in November 2003.  Rouse concluded that, "Lt. Davis performed in excess of his lawful authority, for personal advantage for himself [and] the Black Guardians, . . . ."  IA File 2004/02/15, page 10, (Staff Case Review, at 8).  Rouse recommended a ten-day suspension and removal of Davis from CID.  Id.

On July 8, 2004, Rouse met with the Crimes Analysis Unit.  Davis was the direct supervisor of this Unit.  Rouse did not notify Davis of the meeting.  Rouse stated in his deposition that the failure to notify Davis was an oversight.  Rouse 2009 Deposition, Davis Excerpts, at 159.  On July 13, 2004, Davis sent Rouse a memorandum.  Davis Memorandum, Exhibit 3, Memorandum dated July 13, 2004.  The memorandum stated, in part, "As the Lieutenant in charge . . ., [I] should have been notified and included in the meeting.  This is not the first time this problem has occurred.  I would appreciate an explanation from you, in writing, as to why I was not notified

or included." Id.

Rouse responded with a memorandum dated August 3, 2004.  Rouse stated in writing that he could meet with anyone he wished in CID without notifying Davis or giving Davis an explanation.  Rouse 2009 Deposition, Davis Excerpts, at 158-59.  Rouse stated in his deposition that he did not tell Davis that the failure to invite was an oversight because he did not have to explain his actions to Davis.  Id., at 159.  Rouse also stated that he did not recall any other time in which he met with the Crimes Analysis Unit without notifying Davis.  Id., at 160.

On August 3, 2004, Davis filed the 2004 Action.

In September 2004, Rouse assigned Davis to develop and supervise the process for selecting detectives for CID.  Davis Memorandum: attached Excerpts of Deposition of Donald Kliment taken February 24, 2009 Deposition (Kliment 2009 Deposition, Davis Excerpts), at 127-29; Rouse 2009 Deposition, Davis Excerpts, at 236.  According to Rouse, Davis refused to do the assignment.  Rouse again asked that Davis be removed from CID.  The police legal advisor Josh Carter advised Rouse to give Davis more time.  Rouse did so.  Rouse 2009 Deposition, Davis Excerpts, at 236-37.

Davis then prepared a memorandum regarding the detective selection process.  Davis Memorandum, Exhibit 9, Memorandum from Davis to Rouse, dated September 28, 2004.  Davis stated that the Department's detective examination, "is a poor evaluation tool to select SPD detectives." Id.  Davis then summarized the process used by the Phoenix, Arizona, and Los Angeles, California, police.  Davis concluded the memorandum with a discussion about why he should not supervise the detective selection process:

> Additionally, I have several concerns with my selection to chairperson of the testing process.  I am not refusing this assignment.  However, I do not feel this is the proper time for me to lead the testing selection process for detective for the following reasons.
>
> • I have spoken out publicly as the Vice President of the Black Guardians Association regarding corruption with our promotional process.
>
> • I have spoken publicly of the fact SPD has no black detectives.
>
> • I have two (2) pending federal racial discrimination lawsuits pending trial against the SPD and the City of Springfield.
>
> • I fee that my lead role in the detective selection process may cause a reverse discrimination charge against me if a black candidate is selected for a detective position.

Because of the recent racial discrimination charges filed against the city of Springfield I feel the best solution would be for the Human Resources Department to validate and administer the detective examination. It would be my pleasure to assist in the process and I hope my suggestions will be considered.

Id., at 4.

Rouse explained that Davis' memorandum stated:

Something about he wanted to copy the process in Phoenix, Arizona, Los Angeles, California, but then at the end he listed four bullet point why he couldn't complete the assignment and one of them was because he was afraid of being sued.

Rouse 2009 Deposition, Davis Excerpts, at 237. Rouse explained that the memorandum said Davis would be sued for reverse discrimination. Id., at 238. Rouse stated that Davis' memorandum was not sufficient. Rouse 2009 Deposition, Davis Excerpts, at 236. Rouse said that Davis' suggestions were not realistic because the Department's officers were unionized and the Phoenix officers were not. Id., at 239-40.

In October 2004, Lieutenant Dodson, the head of Special Investigations, left CID. Rouse stated in his deposition that he had Dodson transferred out of CID because of his poor performance in connection with an incident in which a security guard was shot at the Illinois State Capitol building. Rouse stated that he counseled Dodson orally about the incident

and then recommended Dodson's transfer.  Rouse stated that he made the transfer recommendation orally at a meeting with Kliment, the Assistant Chief, and the Deputy Chiefs.  <u>Rouse 2009 Deposition, Davis Excerpts</u>, at 118-22.

Upon Dodson's transfer, Davis was assigned to supervise both General Investigations and Special Investigations.  Davis supervised both divisions until January 2005.  At that time, Lieutenant Greg Williamson was put in charge of General Investigations, and Davis was put in charge of Special Investigations.

On October 7, 2004, Kliment reviewed the IA investigation regarding the November 2003 Lenhart interview incident.  Kliment issued a two-day suspension to Davis as discipline for Davis' actions in the incident.  <u>2004/02/15 Civil Service Commission File</u>, <u>Memorandum from Donald Kliment to Rickey Davis, dated October 7, 2004</u>.  Davis appealed to the Civil Service Commission.  On October 22, 2004, the Civil Service Commission issued its decision reducing the discipline to a one-day suspension.  <u>2004/02/15 Civil Service Commission File</u>, <u>Conclusion of Pre-Deprivation Hearing, dated October 27, 2004</u>.

On November 9, 2004, Davis filed a charge of discrimination because

of the one-day suspension.   Davis alleged that the suspension was in retaliation for his exercising his rights under Title VII to speak out on issues of racial discrimination.   <u>Davis Memorandum</u>, Exhibit 25, <u>Charge of Discrimination dated November 9, 2004</u>.   Davis asserted that he had previously filed charges of discrimination against the City; he was issued a two-day suspension; the suspension was without merit; and the timing raises an inference of retaliation.  <u>Id.</u>

On November 16, 2004, Sergeant Ronald Vose called Rouse and asked to meet.  Vose was then assigned to the Narcotics unit in CID.  Rouse and Vose met in an alley.  Vose told Rouse that a defense attorney in an on-going murder trial was going to try to discredit Detective Paul Carpenter or Detective James Graham on the witness stand.  The defendant in the trial was accused of murdering a woman named Tonia Smith.  Graham and Carpenter were assigned to the Major Case Unit.  Vose told Rouse that the attorney was planning to try to get one of the officers to perjure himself.  Rouse said he could not attend, but he told Vose to attend the trial and report what he saw.  <u>Rouse 2009 Deposition, City Excerpts</u>, at 163-66.  Rouse did not notify Davis that he had told Vose to attend the trial.  Vose, Carpenter, and Graham all reported to Davis.

On December 8, 2004, Lieutenant Williamson held a meeting of the Armed Robbery Suppression Program (ARSP).  CID Sergeants Timothy Young and Pat Ross attended the meeting.  Sergeant Young was assigned to report on all commercial armed robbery cases, and Sergeant Ross was assigned to monitor commercial armed robberies and report to Lieutenant Williamson.  Young and Ross reported directly to Davis.

On December 10, 2004, Davis sent a memorandum to Rouse complaining that Rouse violated the chain of command by directing Vose to attend the murder trial, and by allowing Williamson to assign tasks to Young and Ross at the ARSP meeting.  The memorandum stated:

> As the general and special criminal investigations lieutenant, I am responsible for the day to day operation of the criminal investigation division and I am accountable and responsible for Sgt. Vose and Detectives Graham and Carpenter.  In violation of Department policy, I was not notified that Sgt. Vose was investigating two of my lead detectives during the Tonia Smith murder trial. . . .  I would like an explanation as to why these incidents occurred without my knowledge or approval.
>
> I also understand that on December 8, 2004 at 1000 hours Lt. Williamson held a meeting . . . regarding the [ARSP].  Lt. Williamson ordered . . . Sergeants Tim Young and Pat Ross to attend the ARSP meeting. . . .  As the immediate supervisor of Sgt. Young and Sgt. Ross I should have been notified of these orders; However, I was not notified of the meeting or the assignments given to Sgts' (sic) Young and Ross. . . .  I would like an explanation as to why I was not informed of the meeting

and why Sergeants under my command would be assisting without my knowledge or approval.

Davis Memorandum, Exhibit 5, Memorandum from Davis to Rouse, dated December 10, 2004.

Rouse responded with a memorandum to Davis dated December 22, 2004.  Motion, Exhibit 9, Memorandum from Rouse to Davis dated December 22, 2004.  Rouse stated, in part:

> To begin, let me correct your assertion that Sgt. Vose was "investigating" two member of this Division when he attended the Tonia Smith murder trial.  He was there, with my approval, to observe the proceedings and nothing more.  I approved his attendance because I was unable to attend the proceedings myself due to a scheduling conflict and to the last minute nature of the notification of a potential problem during the conduct of the trial. . . .

> As to your second concern, the Department issued a directive on October 15, 2004, . . . noting that the [ARSP] would be implemented beginning November 1, 2004, and directing affected personnel to review OPS-31.  Therefore, I will assume that you are familiar with that General Order.  If you are not, OPS-31(V)(B) directs the ARSP coordinator (Lt. Williamson) to choose members from the various divisions to serve as members of the ARSP team as well as to establish a schedule and convene meetings of the team. . . .  [L]t. Williamson's actions in convening the complained of meeting and directing the various members of the ARSP team to undertake certain tasks were not only proper, but were in fact required by OPS-31.  However, out of courtesy to you, I will ask Deputy Chief Geiger to have Lt. Williamson carbon copy you future emails relating to this issue.

17

Id.  General Order OPS-31 was a general order issued by Kliment on April 2, 2004, establishing the ARSP and outlining the details of the program. Motion, Exhibit 10, OPS-31.

On February 25, 2005, Vose sent a nineteen-page memorandum to Kliment detailing his concerns that Detectives Carpenter and Graham were engaging in improper conduct.  The opening paragraph of the memorandum stated:

> At the request of my attorney, I am providing you with written notification of the concerns that I have brought forward to my superior over the past 9 months.  I have repeatedly voiced my concerns to Lt. Dave Dodson and Deputy Chief Rouse about possible police misconduct by Detective James Graham and Detective Paul Carpenter.  I raised these issues because I have noticed numerous warning signals or "red flags" in the way these detectives are conducting their investigations, especially the way they are handling drug investigations.  At the very least they are "cutting corners" and using questionable investigative methods. The worst-case scenario is that they are actively involved in intentional police misconduct and criminal violations.

Motion, Exhibit 18, Excerpts of Illinois State Police Investigative Report, dated June 2, 2005, Memorandum from Vose to Kliment dated February 25, 2005.

On May 2, 2005, Carpenter sent Davis a memorandum requesting a transfer to General Investigations.  Motion, Exhibit 7, Memorandum from

<u>Carpenter to Davis, dated May 2, 2005</u>.  Kliment became aware of the transfer request and understood that Davis was holding onto the request and had asked Carpenter to reconsider.  <u>Davis Memorandum</u>, attached <u>Excerpts of Deposition of Donald Kliment taken June 16, 2005 (Excerpts of 2005 Kliment Deposition, Davis Excerpts)</u>, at 153.  Kliment believed Davis could properly ask Carpenter to reconsider, but Kliment also believed that Davis should have passed the request up the chain of command.  On May 8, 2005, Kliment transferred Carpenter out of Davis' unit without telling Davis first.  <u>Id.</u>

On June 2, 2005, Kliment referred Vose's February 25, 2005, memorandum to the Illinois State Police, Division of Internal Investigation, for an independent investigation.  <u>Motion</u>, Exhibit 18, <u>Excerpt of Illinois State Police Investigative Report, dated June 2, 2005</u>.  Davis was not a target of this investigation, and so, was not notified of Kliment's actions.

On July 6, 2005, the Black Guardians Association issued a press release about racial issues within the Department.  The press release stated, in part:

> IN LIGHT OF CURRENT RACIAL PROBLEMS IN THE CITY OF SPRINGFIELD AND IN AN EFFORT TO RESOLVE THEM, MEMBERS OF THE BLACK GUARDIANS

ASSOCIATION HAVE SUBMITTED THE FOLLOWING INFORMATION/RECOMMENDATIONS:

## IDENTIFYING THE PROBLEM

Lack of diversity, racial and internal problems has been a public relations disaster for the Springfield Police Department and the City of Springfield for the past several years. . . .

. . . It is time for all interested parties to take the bold steps necessary to heal our ailing Police Department and City.

Davis Memorandum, Exhibit 27, Press Release dated July 6, 2005 (emphasis in the original).  The press release then contained a series of recommendations. The press release recommended more openness and recruiting targets for minority police officers and an effective recruitment plan.  The press release also recommended the following:

- In the aftermath of the Renatta Frazier scandal, it is obvious that some sworn personnel within the Department violated Department policy and possibly committed criminal acts as well in an effort to drive a Black officer from the Department.  Issues of credibility, integrity, and accountability remain at the forefront of this unresolved scandal.  It is recommended that Individuals involved in this apparent cover-up be publicly held accountable by the City. . . .

Id. (emphasis in the original).  The press release listed Davis as President of the Black Guardians Association.

On July 13, 2005, the issue of racial profiling was discussed at a

Department senior staff meeting.  The meeting consisted of officers of the rank of Lieutenant and above, including Davis.  Most officers present generally believed that racial profiling was not a problem within the Department.  Davis disagreed strongly.  He said that racial profiling had been a problem for years.  He said that he would be willing to sit down with Kliment and discuss the matter.  Davis Memorandum, attached Excerpts of the Deposition of David Dodson, at 31-32.

In August 2005, Rouse again asked Kliment to move Davis out of CID.  Davis Memorandum, attached Excerpts of Deposition of William Rouse taken April 20, 2006 (Rouse 2006 Deposition, Davis Excerpts), at 16-17.

In September 2005, Carpenter reported a rumor to Williamson about Detective James Graham using marijuana.  The supposed source of the rumor was Sangamon County, Illinois, First Assistant State's Attorney Steve Weinhoeft.  Williamson told Rouse, and Rouse told Kliment.  Kliment instructed Williamson and Rouse to meet with Weinhoeft regarding the matter.  Rouse did not inform Davis of the meeting even though Graham reported to Davis.  Kliment stated in his deposition that he commented that Davis and Graham were friends, but he did not tell anyone to keep Davis

21

out of the loop on this matter. Kliment stated in his deposition that he believed Davis could have alerted Graham if Davis knew of the meeting, but he did not make any comment to that effect to anyone. Motion, attached Excerpts of Deposition of Donald Kliment dated February 24, 2009, (Kliment 2009 Deposition, City Excerpts), at 263-64. At the meeting, Weinhoeft said that he knew nothing about the rumor. Rouse said he would have informed Davis if Weinhoeft had confirmed the rumor. Rouse 2009 Deposition, City Excerpts, at 293-95.

On September 8, 2005, Davis wrote a memorandum to Rouse, with a copy to Kliment, complaining that he was not informed of the meeting with Weinhoeft. Davis stated, in part:

> I have two concerns with how this investigation was handled. First, why wasn't I notified of your investigation and second, why was I not included in the meeting with S/A Weinhoeft? These are very serious allegations of a criminal nature. Further, Detective Graham is under my direct command, not Lieutenant Williamson's command.
>
> Several times in the past few years you have excluded me from the Springfield Police Department's Chain of Command procedures when issues regarding staff under my supervision. I was working in my office on September 2, 2005 and available by pager and cell phone. Therefore, I want to know why either Chief Kliment did not advise me of the allegations, yourself or Lieutenant Williamson and why I was not included in the meeting with SA Weinhoeft.

Davis Memorandum, Exhibit 4, Memorandum from Davis to Rouse, dated September 8, 2005. Davis stated in his deposition that he never received a response to this memorandum. Davis Memorandum, attached Excerpts of Deposition of Rickey Davis taken February 18, 2009 (Davis 2009 Deposition, Davis Excerpts), at 48.

In November 2005, Rouse instructed Sergeant Timothy Young to prepare a vehicle report. The report was due November 23, 2005. Rouse 2009 Deposition, City Excerpts, at 50-51. Young reported directly to Davis. Young did not complete the assignment on time. On or about December 8, 2005, Rouse told Davis and Young that he needed the report. Davis stated that Young turned in the report on December 9, 2005. Davis Declaration, ¶ 14.[3] On December 13, 2005, Rouse issued Davis and Young each a written counseling for Young's failure to finish the vehicle report on time. Motion, Exhibit 22 and 23, Counseling Memoranda from Rouse to Young and Davis dated December 13, 2005. Davis has submitted evidence that, in other situations, Rouse counseled officers orally. Rouse counseled Lieutenant Dodson orally regarding the shooting of the security guard at the

---

[3]The City disputes whether Young ever finished the report. Rouse 2009 Deposition, City Excerpts, at 189-90.

State Capitol in 2004.  Rouse 2009 Deposition, Davis Excerpts, at 118-19.

Rouse also counseled Lieutenant Williamson orally for verbalizing his

displeasure with Kliment.  Rouse did not make a written record of the

counseling.  Rouse 2009 Deposition, Davis Excerpts, at 124-25.

In December 2005, Rouse assigned Davis the task of preparing an

annual report on the accomplishments of the entire CID.  Davis

Memorandum, Exhibit 50.  Rouse prepared this report in 2004.  Rouse

2009 Deposition, Davis Excerpts, at 195-96.  The report covered Special

Investigations, General Investigations, and an additional area called Project

Safe Neighborhood.  Davis did not finish the report on time.  Rouse

completed the report and issued Davis a written reprimand.  Davis

Memorandum, Exhibit 54, Springfield Police Department, Internal Affairs

Report Case No. 2006/01/03.  The reprimand stated that Davis willfully

failed to obey or deliberately refused to complete the assignment.  Motion,

Exhibit 24, Written Reprimand from Rouse to Davis dated January 04,

2006.  The written reprimand was also given an IA file number, but no

investigation was conducted.

Rouse talked to Kliment before issuing the written reprimand.  During

this conversation, Rouse again stated that he wanted Davis transferred out

of CID.  Kliment 2009 Deposition, Davis Excerpts, at 218.  According to

Kliment, Rouse viewed Davis as "an obstructionist not doing what he asked

him to do and not completing assignments he gave him and basically just

not participating when asked."  Id., at 219-20.  Kliment stated in his

deposition:

> I think [Rouse] told me he wanted to issue [Davis] a written
> reprimand because he's not doing the – completing the
> assignments that he had given him and he was frustrated and he
> wanted to issue a written reprimand to Rickey.  And I told him
> to go ahead.

Id., at 220-21.

Davis responded to the reprimand with a memorandum to Rouse.

Davis stated that he did not willfully refuse to obey any order.  He

explained that he misplaced the email containing the assignment.  Davis

asked Rouse to remove the reprimand.  Davis stated, "I feel your actions are

retaliatory against me because I have filed a discrimination lawsuit against

the Springfield Police Department."  Davis Memorandum, Exhibit 53,

Memorandum from Davis to Rouse, dated January 5, 2006.

Rouse responded with a memorandum to Davis.  Rouse stated that he

would not remove the reprimand.  Rouse also stated:

> I regret that you believe that the issuance of the written

reprimand is retaliatory in nature. You were previously counseled on December 13, 2005 for unsatisfactory performance. Therefore, I assure you that the written reprimand is performance based designed to correct future unacceptable behavior.

Davis Memorandum, Exhibit 55a, Memorandum from Rouse to Davis dated January 11, 2006. Rouse stated in his deposition that he had disciplined Williamson for various matters, but had not issued written reprimands or initiated IA investigations against him. Rouse 2009 Deposition, Davis Excerpts, at 124-26.

On January 12, 2006, Davis wrote a memorandum to Kliment regarding an Emergency Response Team (ERT) raid at 603 West Capitol Street, Springfield, Illinois. The raid occurred on January 10, 2006. The subject of the raid was wanted for murder. During the raid, officers shot and killed the subject of the raid. Davis stated in the memorandum that Sergeant Chris Mueller mentioned the raid in passing to Davis in the hallway. According to Davis, he was not otherwise informed of the operation. Davis complained that he was not included in the planning of the operation:

As the Special Investigations Lieutenant, I want an explanation as to why I was not notified of the raid during the beginning stages of the planning of this operation, and an explanation as

to why I was not involved in the planning process.  As you know, the Narcotics Sergeants and Officers, and the Criminal Investigation Division Sergeants, all fall under my direct command.  However, <u>none of them</u>, <u>nor any of my superiors</u>, advised me of the planning of this operation.

I feel that my authority was circumvented by the Officers, Sergeants, and my superiors. . . .

I feel I was excluded from the planning process because of my strong position against racial discrimination matters in the SPD, and the racial discrimination lawsuits that I have filed against the Department.  I would like an explanation from you as to why I was excluded from the planning of the raid.

<u>Motion</u>, Exhibit 47, <u>Memorandum from Davis to Kliment, dated January 12, 2006 (emphasis in the original)</u>.

On January 18, 2006, Sergeant Mueller sent a memorandum to Rouse regarding the January 10, 2006, ERT operation.  Mueller stated that he wrote the memorandum in response to a newspaper article in which "Lt. Davis publicly stated that he was not informed about the raid at 603 W. Capitol on 01/10/06."  <u>Motion</u>, Exhibit 47, <u>Memorandum from Chris Mueller to Rouse, dated January 18, 2006</u>.  Mueller stated that during his conversation with Davis in the hallway, he informed Davis of the details of the raid and invited Davis to a meeting of the participants in the raid.  Mueller stated:

I then invited him [Davis] down to the PAC offices where PAC, CIEG, and the U.S. Marshall's [sic] were gathered in preparation for the raid. Lt. Davis did enter the PAC office area and sat down in the same room everyone else had gathered in. He enjoyed a couple of lollipops but did not speak, or if he did, very little. He did not ask for any more raid details and did not attend the ERT briefing that <u>always</u> precedes raids.

. . . .

In summary, Lt. Davis knew of the raid, that it involved many different agencies, that PAC was the primary agency, that SPD's ERT was being utilized, and that the subject was wanted on a murder warrant.

<u>Id.</u> (emphasis in the original).[4]

On February 17, 2006, Rouse initiated two IA complaints against Davis. The first complaint named both Davis and Young. The complaint alleged that Davis and Young falsified monthly report summaries to cover up deficiencies in the Major Case Unit, and purposefully failed to follow Rouse's instructions to investigate a rumor that the Major Case Unit had "shut down." <u>Davis Memorandum</u>, Exhibit 57, <u>IA Complaint 2006/02/14, dated February 17, 2006</u>. Rouse alleged that, in 2004, a Department General Order, "directed sergeants to review cases with their detectives on a weekly basis. Furthermore, lieutenants were to review cases with their

---

[4]The parties do not explain the meaning of the abbreviations PAC and CIEG.

sergeants on a weekly basis." Id.  According to Rouse, "Supervisors were instructed to follow policy and document case management review in monthly summaries.  If they did not meet, that also was to be documented with an explanation as to why it did not occur."  Id.

Rouse further alleged that a rumor was circulating that the Major Case Unit detectives were shutting down.  Rouse stated that Davis and Williamson both acknowledged that they had heard the rumor.  Rouse stated:

> On November 14, 2005, I asked both Lieutenant Rickey Davis and Greg Williamson to discuss and/or document incidents that supported the continuing rumor that the Major Case Unit detective were in 'shut down' mode.  Then I asked each lieutenant that if they believed the 'shut down' rumor was substantiated, to document a course of action they were taking to solve the problem.
> Lt. Rickey Davis responded on November 15, 2005, stating that he could not "independently sustain the truth of such rumors based upon the performance of the unit's investigators'.(sic)

Id.

Rouse stated that CID was reorganized on January 1, 2006, and the responsibilities of the Major Case Unit were transferred to the new Crimes against Persons Unit.  Sergeants Kurt Banks and Shawn Handlin were assigned to this new unit.  Rouse stated that he asked Banks and Handlin

to review open homicide files.  Rouse stated that they found numerous

problems:

> At my direction, Sergeants Kurt Banks and Shawn Handlin have
> been reviewing all open homicide investigations.  During the
> first seven (7) weeks of 2006, they have discovered several
> shortcomings/discrepancies related to the various investigations.
> Reports are missing or never written, evidence has been located
> in the various detectives' working files, and several follow-up
> investigations have not been initiated.  Several of the homicide
> investigations must be initiated years after the reported
> homicide.

Id.  Rouse alleged that Davis and Young falsified records to hide these

problems:

> I believe that both Lt. Rickey Davis and Sgt. Tim Young
> individually and/or in concert conspired to falsify month report
> summaries to purposely and/or deliberately deceive and/or cover
> up deficiencies within the Major Case Unit.

> I believe that Lt. Rickey Davis purposely and/or deliberately
> failed to follow my directions to fully investigate the Major Case
> Unit as it related to the 'shut down' rumor.  Furthermore, I
> believe he then falsified his findings to purposely and/or
> deliberately cover up deficiencies within the Major Case Unit.

> I believe that the actions or inactions of Lt. Rickey Davis and
> Sgt. Tim Young individually and/or in concert conspired to
> purposely and/or deliberately failed (sic) to perform their duty
> as dictated by their individual rank and position.

Id.  The parties have submitted conflicting evidence regarding the accuracy

of Rouse's allegations in this IA complaint.   See Motion, Statement of

Undisputed Facts, ¶¶ 92-117, 121-26, and supporting materials cited therein; Davis Memorandum, Statement of Additional Material Facts, ¶¶ 143-55, 171-79, and supporting materials cited therein.

Rouse's second February 2006 IA complaint alleged that Davis deliberately failed to perform his duties in two specific incidents. Rouse alleged that when Handlin was assigned to the new Crimes Against Persons Unit, Davis told Handlin that he "did not have the training, knowledge, and/or experience to be assigned as a supervisor with the responsibility to investigate shootings and/or homicides." IA File 2006/02/16, IA Complaint.

Rouse then alleged that on January 19, 2009, Davis called out the ERT to raid a mobile home to arrest individuals suspected in a shoot out earlier that day. Davis directed Sergeant Todd Taylor to meet with him, "to coordinate a plan of action." Id. Young called Assistant State's Attorney Weinhoeft and requested his presence at the meeting. Before Taylor and Weinhoeft arrived for the meeting, however, Young and Davis left the police station to have coffee. Id. Rouse stated in his deposition, that Handlin called him to complain that Davis and Young just left the strategy meeting after activating the ERT. According to Rouse, Handlin told him that Weinhoeft and the ERT coordinator Dennis Arnold arrived and "the

lieutenant that activated this ERT is no longer present." Rouse 2009 Deposition, City Excerpts, at 31, 33-35, 41-43; Motion, attached Excerpts of Deposition of Kurt Banks, at 27-28.

In the second incident, Rouse alleged that on February 15, 2006, officers found the human remains of a victim of a homicide. The body had been dumped some fifteen months earlier. Lieutenant Davis arrived at the scene. Rouse alleged that after the officers had been briefed, Davis and Young, "verbalized their intent on going to have coffee and left the scene at about 1400 hours." Motion, Exhibit 29, Springfield Police Department Internal Affairs File No. 2006/02/16 (IA File 2006/02/16), IA Complaint.

Rouse stated in his deposition that Davis should have stayed at the scene to manage the investigation, "His work is being present so when they have questions or concerns or they have four other crime scenes throughout the city to go to, that's his responsibility." Rouse 2009 Deposition, City Excerpts, at 210. According to Rouse, "He leaves when everything is done." Id. Handlin stated in his deposition that he complained to Rouse about the incident, although his complaint was with Young's actions rather than Davis'. Rouse 2006 Deposition, Davis Excerpts, at 31-32; Davis Memorandum, attached Excerpts of Deposition of Noll Shawn Handlin, at

101-02.  Rouse stated in his deposition that the officers left behind by Davis

at the scene competently investigated the matter.  Rouse 2006 Deposition,

Davis Excerpts, at 31-32.

Rouse concluded his allegations in the IA complaint:

Lt. Rickey Davis first expresses his lack of confidence in Sgt.
Shawn Handlin then refuses to supervise, train and sustain his
subordinates.  Lt. Rickey Davis possess the knowledge, training,
and experience yet refuses to perform his duty as his rank and/or
assignment dictates.  He selected coffee over his service to his
subordinates, his department, and the citizens of Springfield.

IA File 2006/02/16, Investigative Note dated February 16, 2006.

Davis has included in his Declaration a response to Rouse's allegations

regarding the two coffee incidents.  With respect to the January 19, 2006,

incident, Davis stated that:

I called the team together and discussed the matter, made
decisions, and we alerted ERT that we might need them, but still
needed to get the affidavit and search warrant together, get it
approved by the States Attorney and get a judge to sign the
search warrant . . . .  I walked out of the building across the
street and around the corner to get some coffee, and I let the
team know that's what I was doing.  Every member of the team
had my cell phone.  No one told me I was needed before I left,
no one called me in the few minutes I was gone and said I was
needed, and no one told me when I returned that anything had
happened requiring my presence.  I was gone only long enough
to walk to the coffee store, get coffee and walk back.

Davis Memorandum, attached Declaration of Rickey Davis dated July 20,

2009 (Davis Declaration), ¶ 21.

With respect to the February 15, 2006, incident, Davis stated that he

took care of the situation:

> On the issue of skeletal remains in January 2006, I was at the
> scene, met with all the sergeants and coordinated the activities,
> and met with both Lt. Dowis from Patrol to coordinate coverage
> of the crime scene by his officers on second shift, and Assistant
> Chief Caldwell, who was present and who asked me to handle
> the media who were present. Lt. Williamson was the Lieutenant
> over the crime scene technicians and he was present. I full (sic)
> participated in the crime scene, and after all the work that
> needed to be done was assigned, I left to return to the office to
> work and continued to receive updates throughout the coming
> hours as I had instructed. On the way I stopped for coffee and
> made no secret of it. Sgt. Young was at the crime scene because
> he was assisting in the oversight and training of the new
> Sergeants. No one contacted me to ask for additional training
> or assistance before I left, while I was en route to the office or
> when I returned. My stop was only long enough to pick up a
> cup of coffee.

Davis Declaration, ¶ 8.[5]

In February 2006, Rouse again asked Kliment to move Davis out of

CID. Rouse 2006 Deposition, Davis Excerpts, at 16-17. Kliment decided

to move Davis out of CID at this time. Kliment stated that he moved Davis

---

[5]The City has also listed a number of additional errors that, according to Rouse,
Davis committed for which no discipline was issued. See Motion, Statement of
Undisputed Facts, ¶¶ 151-67, and supporting material. Davis disputed these claims.
Davis Memorandum, Disputed Defendant Material Facts, ¶¶ 151-67, and supporting
material. For purposes of this Motion, the Court must view these disputed facts in the
light most favorable to Davis.

because of performance issues.  Kliment 2009 Deposition, City Excerpts, at 269-71.

On March 8, 2006, Davis was transferred to the Patrol Division. Initially, Davis was placed on the third watch, or night shift, but his assignment was changed to second watch, or evening shift.  About this same time, however, Davis went on medical leave.  Davis remained on medical leave for the remainder of his employment with the Department.  Davis, thus, never worked in the Patrol Division after the March 8, 2006, transfer. Motion, at 32, Statement of Undisputed Fact, ¶ 182; Davis Memorandum, at 7, Response to Undisputed Facts, ¶ 182.

On June 28, 2006, the Illinois State Police issued an Investigative Summary Report on the investigation of Graham and Carpenter.  Motion, Exhibit 19, Investigative Summary, dated June 28, 2006.  The Report found that Graham and Carpenter engaged in improper conduct in several investigations.    The Report also criticized Rouse, Dodson, Davis, Williamson, and Young for various managerial and supervisory failures that violated Departmental rules of conduct.  Id.  These supervisors were not the target of the investigation, and so, did not receive notice of the investigation before the issuance of this report.  Motion, at 14, Statement of Undisputed

Fact, ¶ 80; Davis Memorandum, at 4, Response to Undisputed Facts, ¶ 80.

Upon receiving the Summary Report, an IA investigation was opened

against Graham, Carpenter, Rouse, Dodson, Davis, Williamson, Young, and

Lieutenant Clay Dowis.  Motion, Exhibit 20, Springfield Police Department

Internal Affairs Report on IA Case No. 2005/06/52.

On June 30, 2006, Davis filed the charge of discrimination that

formed the basis of 2007 Action.     Motion, Exhibit B, Charge of

Discrimination No. 440-2006-07545, dated June 30, 2006.  Davis alleged

racial discrimination, retaliation, and a hostile work environment.  Davis

alleged that he spoke out on racial issues, filed charges of discrimination

previously, and had two pending discrimination lawsuits against the City.

He alleged that:

> Complainant . . . has been routinely deprived of important
> information necessary to effectively perform his duties, was
> excluded from meetings and decisions regarding Criminal
> Investigations, and was not consulted when members of the
> Criminal Investigations Division were transferred out of that
> Division, although white officers, and officers who have not
> complained about race were consulted in such situations.

Id. ¶ 5(b).  Davis also alleged that he had been subjected to unjustified

discipline and IA complaints.  Id., ¶¶ 5(e) & 5(g).  Davis also alleged that

he was demoted when he was transferred from CID to the Patrol Division.

Id., ¶ 5(h).  Davis alleged that he had been treated differently than others.

He alleged that:

> Rouse has treated Complainant in such a manner as to create a
> hostile working environment for Complainant, failing to provide
> appropriate feedback and refusing and failing to communicate
> with Complainant on matters of importance. . . .

Id., ¶ 5(j).  Finally, Davis alleged, "As a result of the retaliatory conduct on

the part of Respondent, Complainant is now on leave from work due to

stress and other medical conditions."  Id., ¶ 7.

On September 5, 2006, Davis submitted an application for a duty

related disability pension to the Springfield Pension Fund (Fund).  Davis

Memorandum, attached Excerpts of Deposition of Alicia Barrington

(Barrington Deposition), at 5-6.  Alicia Barrington received and maintained

such applications for the Fund.  Barrington faxed a copy of the application

to the Fund's counsel.  Barrington telephoned the five members of the

Fund's Board to inform them that Davis had filed the application claiming

that he was disabled due to depression.  Barrington Deposition, at 8-9, 11.

Barrington stated that applications were kept confidential.  She locked the

application in her office.  Id., at 13-14.  Barrington stated that she did not

tell anyone else about the application.  Id., at 16-17.

Kliment stated that Alicia Barrington called him to tell him that Davis had applied for a duty related disability pension.  Kliment stated, however, that he did not know that Davis based his application on depression.  Kliment also stated that he did not talk to anyone from a newspaper about Davis' application  <u>Kliment 2009 Deposition, City Excerpts</u>, at 137-40.

On September 14, 2006, a local newspaper, the Illinois Times, ran a story that Davis had filed for a duty related disability pension due to depression.  The story stated that Davis declined comment.  The President of the Fund's Board declined comment.  Davis stated that he was not the source of the information in the Illinois Times article.   <u>Plaintiff's Memorandum in Opposition to Motion to Quash Subpoena (d/e 207)</u>, Exhibit 1, <u>Declaration of Rickey R. Davis</u>, ¶ 2.

On September 19, 2006, the Court entered partial summary judgment in favor of the City on part of the 2004 Action.  The Court entered summary judgment in favor of the City on Davis §§ 1981 and 1983 claims, but denied the City's request for summary judgment on Davis' Title VII claims.  <u>2004 Action Summary Judgment Opinion</u>.

On October 26, 2006, a pre-deprivation hearing was held with respect to the charges filed based on the June 28, 2006, Illinois State Police

Investigative Summary regarding the Graham and Carpenter investigation. After the hearing, Graham and Carpenter were terminated and Rouse, Dodson, Williamson, and Dowis all received written reprimands. <u>IA Case No. 2005/06/52 Report</u>. Written reprimands were recommended for Davis and Young, but Davis was never formally served because Davis was on medical leave and Young had already retired. <u>Motion</u>, at 15, <u>Statement of Undisputed Fact</u>, ¶¶ 82, 84; <u>Davis Memorandum</u>, at 4, <u>Response to Undisputed Facts</u>, ¶¶ 82, 84.

On November 14, 2006, the Court entered partial summary judgment in the 2003 Action. The Court entered summary judgment in favor of the City on all of the plaintiffs' §§ 1981 and 1983 claims and on all of the Title VII claims of all of the remaining plaintiffs except Davis and Lieutenant Lea Joy. The Court entered partial summary judgment in favor of the City on most of Davis' and Joy's Title VII claims, but denied summary judgment on certain claims. <u>2003 Action Summary Judgment Opinion</u>.

On November 16, 2006, the IA Investigation No. 2006/02/14 against Davis was closed without any finding. The investigator reported that he closed the investigation because he was unable to interview Davis. Davis was on medical leave, and the investigator was instructed not to contact him

for an interview.  Davis Memorandum, Exhibit 17, Memorandum from Lt. Craig T. Sim to Deputy Chief Robert Williams, dated November 16, 2006.

On December 20, 2006, Davis sent Kliment a letter of retirement. The body of the letter stated:

> This letter is to inform you than I am retiring from my position with the Springfield Police Department effective January 3, 2007.
>
> If I can be of any assistance during this transition, please let me know.

Motion, Exhibit 2, Letter from Davis to Kliment dated December 20, 2006. Davis' retirement became effective January 3, 2007.

On January 8, 2007, IA Investigation No. 2006/02/16 was closed without resolution because Davis retired.  IA File 2006/02/16, Investigative Note dated January 8, 2007.

On April 10, 2007, Davis filed the 2007 Action.[6]  Davis originally named the City and Rouse, Kliment, and City Mayor Timothy J. Davlin as

---

[6]The trial on the 2004 Action commenced on September 10, 2007.  On September 14, 2007, the jury found in favor of the City on Davis' Title VII discrimination, but could not reach a verdict on his retaliation claim.  The retrial of the 2004 Action retaliation claim remains part of this consolidated action.

On January 3, 2008, trial commenced on the 2003 Action.  On January 11, 2008, the jury found in favor of Davis on one retaliation claim and awarded $150,000.00, in damages.  The jury found in favor of the City on all other claims.  Case No. 03-3007 Minute Entry entered January 11, 2008.

defendants.  Davis subsequently voluntarily dismissed the claims against Rouse, Kliment, and Davlin in order to consolidate the two cases.  <u>2007 Action, Text Order entered April 25, 2008</u>.  The City now seeks summary judgment on Davis' claims in the 2007 Action.

<u>ANALYSIS</u>

At summary judgment, the City must present evidence that demonstrates the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to Davis.  Any doubt as to the existence of a genuine issue for trial must be resolved against the City.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Once the City has met its burden, Davis must present evidence to show that issues of fact remain with respect to an issue essential to his case, and on which he will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Title VII provides, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  This provision prohibits both disparate treatment in employment and racially hostile work environments.  Title VII also protects employees from retaliation.  The Act provides, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).  An individual who believes that he has been discriminated or retaliated against is entitled to bring a charge before the EEOC and a lawsuit against his employer if the EEOC does not resolve the matter. 42 U.S.C. § 2000e-5.

The courts have developed both direct and indirect methods of presenting evidence at summary judgment to show that issues of fact exist at the summary judgment stage in Title VII cases.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  At any trial, however, a plaintiff bears the burden to prove racial discrimination and retaliation.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).  Davis may use either the direct or indirect method to show that issues of fact exist on his Title VII disparate treatment claims.  Forrester v. Rauland-Borg Corp., 453 F.3d 416 (7th Cir. 2006); Stone v. City of Indianapolis, 281 F.3d 640 (7th Cir.

2002); <u>Riordan v. Kempiners</u>, 831 F.2d 690, 695-96 (7th Cir. 1987).

To establish disparate treatment under the direct method, Davis must present direct evidence that he suffered an adverse employment action and that his race was a motivating factor.  An adverse employment action is a loss of compensation or benefits, such as demotion or denial of promotion, or a material reduction in duties and responsibilities.  <u>Smart v. Ball State University</u>, 89 F.3d 437, 441 (7th Cir. 1996).  Furthermore, direct evidence means evidence that establishes each element without resort to inferences from circumstantial evidence.  <u>Stone</u>, 281 F.3d at 644.

To establish retaliation under the direct method, Davis must present evidence that he opposed actions that he believed violated Title VII, and as a result, suffered an adverse retaliatory action.  <u>Stone</u>, 281 F.3d at 644.  Davis does not need to present evidence that the acts that he challenged actually violated Title VII, only that he reasonably believed that the acts violated Title VII.  <u>Hamner v. St. Vincent Hosp. and Health Care Center, Inc.</u>, 224 F.3d 701, 707 (7th Cir. 2000).  An adverse retaliatory action is a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of discrimination.  <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006).

Davis may also proceed at summary judgment under the indirect method.  In his disparate treatment claim, Davis must present evidence of a prima facie case that: (1) he is a member of a protected class; (2) he was meeting his employer's reasonable expectations; (3) despite this, he suffered an adverse employment action; and (4) a similarly-situated person outside the protected class was treated more favorably.  See Gorence v. Eagle Food Center, Inc., 242 F.3d 759, 765 (7th Cir. 2001).  To be similarly-situated, a person must be directly comparable in all respects.  Burks v. Wisconsin Dept. of Transportation, 464 F.3d 744, 751 (7th Cir. 2006).  Relevant factors to show this include whether the employees reported to the same supervisor, whether they were subject to the same standards and whether they had comparable education, experience, and qualifications.  Id.

Once Davis has met this burden, the City must present a valid non-discriminatory reason for the decision.  Davis must then present evidence that the stated reason is a pretext.  Gorence, 242 F.3d at 765.  A pretext is a lie.  The plaintiff, therefore, must present evidence that the stated reason is not the true reason for the actions; it is not sufficient to prove that there is no factual basis for the stated reason or that the stated reason was not sufficient to motivate the action.  Forrester, 453 F.3d at 418-19.

To establish retaliation under the indirect method, Davis must present evidence that: (1) he opposed actions that he believed violated Title VII; (2) he was subjected to an adverse retaliatory action; (3) a similarly-situated employee who did not engage in protected activity was not subjected to an adverse retaliatory action; and (4) he was performing his duties satisfactorily.  Stone, 281 F.3d at 644.  If he presents evidence that would establish this prima facie case, then the City must present a valid, non-retaliatory reason for the employment decision.  Id.  Davis must then present evidence that the stated reason is a pretext.  Id.

To establish a racially hostile work environment, Davis must show that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was severe and persuasive so as to alter the conditions of his employment and create a hostile or offensive work environment; and (4) there is a basis for employer liability.  Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).  In assessing the severity and pervasiveness of the City's conduct, the Court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." <u>Smith v. Sheahan</u>, 189 F.3d 529, 533-34 (7th Cir. 1999). The Court must apply both an objective and a subjective standard: Davis' evidence must indicate both that: (1) a reasonable person would perceive his environment to be hostile or abusive, and (2) Davis subjectively perceived the environment to be so. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998). With these principles in mind, the Court will address each of Davis' claims.

<u>HOSTILE WORK ENVIRONMENT</u>

Davis presented no evidence of a racially hostile work environment. No evidence indicated that the City created a severe and pervasive abusive environment. Davis presented no evidence of racial epithets, threats of physical violence, humiliating or degrading comments, rude gestures, or other behavior that is typically part of a hostile work environment. <u>See</u> <u>e.g.</u>, <u>Boumehdi v. Plastag Holdings, LLC</u>, 489 F.3d 781, 788-89 (7th Cir. 2007); <u>Carr v. Allison Gas Turbine Division, General Motors Corporation</u>, 32 F.3d 1007, 1008-09 (7th Cir. 1994).

Davis argues that he may maintain a claim for a retaliatory hostile work environment without demonstrating that the environment was racially hostile; he need only show that the work environment was hostile due to

retaliation.  However, Congress distinguished between discrimination and retaliation in Title VII.   42 U.S.C. § 2000e-2(a)(1)(prohibiting racial discrimination); 42 U.S.C. § 2000e-3(a) (prohibiting retaliation).  A hostile work environment claim is founded on Title VII's prohibition against discrimination, not on its separate prohibition against retaliation.  See e.g., Carr, 32 F.3d at 1009.  Davis, therefore, must present evidence of a severe and pervasive racially hostile work environment to maintain a hostile work environment claim.  Evidence of retaliatory acts that are not independently racially hostile cannot support a hostile work environment discrimination claim.

The Court recognizes that racially hostile actions may support both a hostile work environment discrimination claim and a retaliation claim if the employer created a severe and pervasive racially abusive work environment in order to retaliate against the plaintiff employee for engaging in protected activity.  Drake v. Minnesota Mining & Manufacturing Company, 134 F.3d 878, 886 (7th Cir. 1998); Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996).   Davis has no evidence that the City created such an environment in this case.

Davis cites persuasive authority from the First Circuit that a

retaliatory hostile work environment can exist without evidence that the environment was racially hostile and abusive.  Billings v. Town of Grafton, 515 F.3d 39, 54 n.13 (1st Cir. 2008).  The Billings Court used the phrase "retaliatory hostile work environment" in dicta in a footnote.  The Billings Court cited as authority for this reference, the case of Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005).  The Noviello Court held that acts that constitute a sexually hostile work environment could support a retaliation claim.  Noviello, 398 F.3d at 89.  The reference to a retaliatory hostile work environment in Billings, thus, is a recognition that if an employer subjects an employee to a racially or sexually hostile work environment for the purpose of retaliating against the employee for engaging in protected activity, then the employer may be liable for both a hostile work environment claim and a retaliation claim.  To maintain both claims, however, the employee must have evidence that the work environment is racially or sexually hostile.  Davis has no such evidence.  The City is entitled to summary judgment on the hostile work environment claim.

RETALIATION

Davis is proceeding under the direct method of proof.  He claims that the evidence shows that from the moment he filed his Title VII charge of

discrimination on November 6, 2003, because Kliment had not promoted him to Deputy Chief, Kliment and Rouse engaged in a pattern of retaliation that finally led to his transfer out of CID and his ultimate constructive discharge. The Court agrees that the evidence creates an issue of fact. After that date, Kliment and Rouse initiated IA investigations against Davis and subjected him to various forms of formal discipline. A jury could find that investigations and disciplinary actions are sufficiently severe to constitute actionable retaliatory acts under <u>White</u>. If a jury believes Davis' version of events, all of these investigations and disciplinary actions were unreasonable and unwarranted. Kliment and Rouse also took actions at various times without notifying Davis when such notice was normally provided. All of this evidence could support a finding that Kliment and Rouse engaged in these acts for the purpose of retaliating against Davis for filing the November 6, 2003, charge of discrimination and bringing the 2004 Action.

The City argues that much of Davis' retaliation claim is barred by the statute of limitations. The Court agrees. The retaliatory actions must have occurred within 300 days of the date of the filing of the charge of discrimination. <u>See</u> 42 U.S.C. §2000e(5)(e) (the time frame is 300 days because Illinois has a state agency, the Illinois Department of Human

Rights, which provides a state process to remedy employment discrimination).  Davis filed the charge on June 30, 2006, so Davis' claim is barred for all retaliatory acts that occurred before September 3, 2005. Davis argues that the continuing violation doctrine applies because Davis is pursuing a hostile work environment claim.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002).  As explained above, however, the City is entitled to summary judgment on the hostile work environment claim.  Thus, Davis cannot use the hostile work environment theory to try to extend the statute of limitations.  The City is entitled to partial summary judgment on the retaliation claims based on acts that occurred before September 3, 2005.

The City also argues that it is entitled to summary judgment on Davis' retaliation claim based on the September 14, 2006, news story about his disability retirement application.  The Court again agrees.  Davis has presented no evidence that someone acting within the scope of his authority for the City leaked the story to the newspaper.  Absent such evidence, Davis cannot establish that the City should be liable for the leak.  Davis argues that Kliment leaked the story, but he has no evidence.  The City is entitled to partial summary judgment on this aspect of Davis' retaliation claim.

Davis, however, may proceed to trial on the remainder of his retaliation claims based on acts that happened after September 3, 2005.

DISPARATE TREATMENT

Davis also asserts a claim for disparate treatment discrimination. He is again proceeding under the direct evidence method. Under any method of proof, Davis must establish an adverse employment action. The only adverse employment action shown was the March 8, 2006, transfer to Patrol.[7] The Court has previously found between these two parties that a jury could conclude that the transfer from CID to Patrol was an adverse employment action. 2003 Action Summary Judgment Opinion, at 64. Davis' direct evidence of the City's intent, however, shows a retaliatory motive rather than a discriminatory motive. Davis' evidence, when viewed most favorably to him, shows that Kliment and Rouse took a series of actions against Davis because he complained and filed the 2004 Action because Kliment picked Rouse over Davis for the Deputy Chief spot. Rouse and Kliment's actions culminated in Davis' transfer to Patrol. The direct evidence method supports a retaliation claim, not a disparate treatment claim, for the March 2006 transfer.

---

[7]The Court discusses the constructive discharge claim separately infra.

51

Davis also argues that he should be allowed to proceed past summary judgment if his claim is supported by the indirect method, even though he is not proceeding under the indirect method. Even so, Davis fails to make a prima facie indirect case. Davis identifies no similarly situated individual who was treated differently in connection with the March 2006 transfer. Without such proof, he fails to make a prima facie case. The City is entitled to summary judgment on Davis' disparate treatment discrimination claim.

<u>CONSTRUCTIVE DISCHARGE</u>

Last, Davis asserts a claim for constructive discharge. To establish constructive discharge, Davis must present evidence that, "his working conditions were so intolerable that a reasonable person would have been compelled to resign." <u>Drake</u>, 134 F.3d at 886 (quoting <u>Rabinovitz v. Pena</u>, 89 F.3d 482, 489 (7th Cir. 1996)). Davis must show more than ordinary Title VII retaliation because "in the 'ordinary' case, an employee is expected to remain employed while seeking redress." <u>Drake</u>, 134 F.3d at 886.

Davis has no evidence of anything more than an ordinary case of retaliation. If anything, his working conditions were more tolerable than the ordinary case because he was on indefinite medical leave. He was still a Lieutenant. He could have stayed on leave while he fought to prove

52

retaliation and to clear his record and to return to CID.  The evidence fails to show conditions so intolerable that a reasonable person would have felt compelled to quit.  The City is entitled to summary judgment on the constructive discharge claim.

THEREFORE, Defendant City of Springfield, Illinois' Motion for Summary Judgment (d/e 251) is ALLOWED in part and DENIED in part. The Court enters partial summary judgment in favor of the Defendant City of Springfield and against Plaintiff Rickey Davis on the following claims alleged in the 2007 Action:

(1)    all of Davis' claims under 42 U.S.C. §§ 1981 and 1983;

(2)    all of Davis' claims for disparate treatment discrimination and hostile work environment discrimination under Title VII;

(3)    all of Davis' claims for retaliation under Title VII that are based on acts that occurred before September 3, 2005;

(4)    Davis' Title VII retaliation claim related to the September 14, 2006, Illinois Times newspaper article about Davis' application for duty related disability retirement; and

(5)     Davis' Title VII claim of constructive discharge.

The Court denies summary judgment for Davis' retaliation claims based on

the other actions that occurred on or after September 3, 2005.

IT IS THEREFORE SO ORDERED.

ENTER:  August 17, 2009

            FOR THE COURT:


                           s/  Jeanne E. Scott
                         JEANNE E. SCOTT
                         UNITED STATES DISTRICT JUDGE